UNITED STATES of America, Plaintiff,

Sidney Williams, et al.,
Plaintiff–Intervenors,

v.

The CITY OF MONTGOMERY,
ALABAMA, et al., Defendants,

Gordon M. Ledbetter and John D.
Shumway, Defendant–Intervenors.

Carolyn JORDAN, etc., et al., Plaintiffs,

Sandra M. Pierce–Hanna, et al.,
Plaintiff–Intervenors,

v.

John WILSON, etc., et al., Defendants,

Gordon M. Ledbetter and John D.
Shumway, Defendant–Intervenors.

Civ. A. Nos. 3739–N, 75–19–N.

United States District Court,
M.D. Alabama, N.D.

June 29, 1990.

Marybeth Martin, Philip Eure, Employment Litigation Section, Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiff.

Thomas M. Goggans, Montgomery, Ala., for white male police officers of the City of Montgomery.

Donald Watkins, Kenneth L. Thomas, Massey, Means & Thomas, Montgomery, Ala., for Williams, et al.

Julian McPhillips, Kenneth Shinbaum, McPhillips, DeBardelaben & Hawthorne, Montgomery, Ala., for Willie Davis re challenge to appointment.

Vanzetta McPherson, Montgomery, Ala., for Tommi Alford re challenge to appointment.

J. Richard Cohen, Southern Poverty Law Ctr., M. Wayne Sabel, Argo, Enslen, Holloway & Sabel, Montgomery, Ala., for Pierce-Hanna & Oyler.

Robert C. Black, Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for all defendants except Wade L. Moss and Montgomery City–County Personnel Bd.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., for Wade L. Moss and Montgomery City–County Personnel Bd.

George B. Azar, Azar & Azar, Montgomery, Ala., for Folmar, Wilson, McGilvray, Eckerman, Cooper & Duffee.

Gary E. Atchison, Montgomery, Ala., for Boyd.

Theron Stokes, Montgomery, Ala., for Atty. Sabel re attys. fees.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

In these two cases, Lieutenant Tommi Lee Alford claims that the City of Montgomery Police Department's refusal to promote her to captain was retaliatory and in violation of the department's court-ordered interim promotion plan. Based on the evidence presented at a hearing on June 5, 1990, the court holds that Alford's claim has merit and that she is thus entitled to appropriate relief.

### I.

The events leading up to the filing of Alford's claim against the defendants—the City of Montgomery, Alabama and its mayor and police chief—may be summarized as follows. On November 17, 1986, in response to claims filed by the "Pierce–Hanna intervenors," who represent a class of female officers in the police department, this court found that the department's promotion system had both the purpose and effect of discriminating against these officers in violation of Title VII of the Civil Rights Act of 1964, as amended.[1] *Jordan v. Wilson (Jordan I)*, 649 F.Supp. 1038 (M.D.Ala.1986). The court found that "discriminating against women because they are women was and remains the 'standard operating procedure' within the City of Montgomery Police Department." *Id.* at 1058. The court instructed the defendants that the department's promotion procedures "must be changed or replaced." *Id.* at 1062.

Approximately six months later, on May 20, 1987, as part of the relief in the *Jordan* litigation, the court ordered the defendants to implement an interim promotion plan which had been approved by the court. *Jordan v. Wilson (Jordan II)*, 667 F.Supp. 772 (M.D.Ala.1987). The relief also applied to a companion case in which the police department was subject to orders prohibiting racial discrimination in hiring and promotions. *Id.; see also Sims v. Montgomery County Commission*, 686 F.Supp. 878, 880 (M.D.Ala.1988) (discussing the history of the race discrimination case). The interim plan has detailed procedures for promotions within the police department. Among them is a procedure which allows a female officer, who believes that she has been denied a promotion for "sexually discriminatory or retaliatory" reasons, to file a claim in this litigation. *Jordan II*, at 780.

Under this procedure, the "mayor must make his promotion selection from among the five highest-ranked candidates certified to him by the [city's] personnel board; but, if at any time the mayor chooses to select a lower-ranked candidate over a higher-ranked candidate, even if all the candidates involved are women, he must state in writing his reasons for rejecting the higher-ranked candidate." *Jordan II*, 667 F.Supp. at 777. The Pierce–Hanna intervenors are then "given 14 days in which to file a court challenge to the rejection, charging that the rejection is either sexually discriminatory or retaliatory. If no objection is made, the mayor may then select the lower-ranked candidate; otherwise, the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge." *Id.* These provisions were based on findings that the mayor and others had engaged in a long-standing scheme "to discourage female officers from pursuing discrimination claims and to retaliate against those who do." *Id.* at 776.

The interim plan also requires that promotions have no adverse impact on either female or African–American candidates, measured in accordance with the "four-fifths rule" of the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D). Under this rule, in general, a group has suffered adverse impact if its selection rate is less than ⅘'s or 80% of the rate for the group with the highest rate. *Jordan II*, 667 F.Supp. at 777.

On July 10, 1989, the Pierce–Hanna intervenors filed a motion claiming that the recent promotion of six males, but no fe-

---

1. 42 U.S.C.A. §§ 2000e through 2000e–17. The court found that the promotion system also violated 42 U.S.C.A. § 1983.

males, to the rank of captain violated the court-ordered interim promotion plan. Several female police officers, including Lieutenant Tommi Lee Alford, openly supported the motion. Alford's support and involvement were particularly prominent because she sat with class counsel for the Pierce–Hanna intervenors at the hearing on the motion and because it was evident to all at the hearing that, if the promotion list were limited to women as the Pierce–Hanna intervenors requested, she would rank first.[2]

On April 9, 1990, this court granted the Pierce–Hanna intervenors' motion and held that the promotion of six males and no females to captain during the period of enforcement of the interim plan violated plan provisions prohibiting adverse impact on female officers. The court wrote:

> The evidence is undisputed that the police department promoted six males but no females to captain during the period of enforcement of the interim plan. The evidence is also undisputed that there were 25 applicants for the rank of captain: 23 males and two females. The success rate for males is therefore 26%, and that for females 0%. These recent promotions have therefore had an adverse impact on women in the police department, because zero is, of course, less than four-fifths of 26%.

*United States v. City of Montgomery*, 744 F.Supp. 1089, 1091 (M.D.Ala.1990). The court required the defendants to promote a female police officer to the rank of captain within 21 days. *Id.*

Pursuant to the court's holding of April 9, the Mayor of Montgomery asked the city's personnel department to certify to him the top five female candidates for captain. All candidates for captain, both male and female, had been ranked according to how well they had done under an evaluation procedure approved as a part of the interim plan. Professional staff from Auburn University at Montgomery created the evaluation procedure and supervised its implementation. Because only two women applied for promotion to captain, the personnel department certified their names only, in the same order with which they had been ranked on the promotion register. Lieutenant Alford, who ranked 13th on the promotion register, was ranked first on the certification, and Lieutenant Martha Cochran, who ranked 18th on the register, was ranked second on the certification.

On April 30, 1990, the mayor passed over Alford's name and chose Cochran to promote. In a letter to the personnel board of that date, the mayor explained that he selected Cochran because he had "personally observed" her in her "daily job performance" and he felt "Lieutenant Cochran ... to be the most deserving of this promotion." The mayor also wrote that "Police Chief Wilson and his administrative staff have also recommended ... Lieutenant Cochran" for the position. Although the interim plan required that the mayor "state in writing his reasons for rejecting the higher-ranked candidate," *Jordan II*, 667 F.Supp. at 777, the mayor offered no reason for refusing to promote Alford.

The Pierce–Hanna intervenors responded quickly. On May 11, 1990, they filed an objection on behalf of Alford in this court, claiming that the defendants have refused to promote Alford because of her involvement in this litigation.[3] *See Jordan I*, 649 F.Supp. at 1064 (prohibiting retaliation against female officers who file charges of discrimination); 42 U.S.C.A. § 2000e–3(a) (prohibiting retaliation against persons because they participated in Title VII litigation). In her objection, Alford also noted that the mayor had not complied with the interim plan's requirement that he state in writing his reasons for rejecting her. In order to simplify the issues, the court orally informed the mayor's attorney on two separate occasions, during in-chambers conferences on May 23 and 25, that the mayor

---

**2.** Alford did not testify at the hearing because her testimony would have been merely cumulative of testimony given by other female officers.

**3.** Class counsel for the Pierce–Hanna intervenors filed the objection. However, because both Alford and Cochran were members of the Pierce–Hanna class, counsel for the Pierce–Hanna intervenors properly noted that he could not continue to represent Alford. Alford, therefore, retained her own attorney. Cochran has retained separate counsel also.

should give written reasons for rejecting Alford as soon as possible. However, not until the hearing on Alford's objection on June 5, 1990, did the mayor finally give his reasons. The mayor informed the court that his reasons were contained in a letter written by Police Chief John Wilson. Wilson's letter is, in part, as follows:

> All candidates considered in this matter appeared, on the surface, to be relatively equal, however based upon years of personal contact with all of them, it is very apparent to me that one of the key ingredients that must be considered to determine who is the most qualified and better able to do the job would be the ability to communicate, work well, and get along with fellow employees, both supervisors and subordinates. There is no doubt in my mind that [Lieutenant M.R. Cochran] far exceed[s] ... [Lieutenant T.S. Alford] in this area.

> During the past years, while all the candidates have had the opportunity to work in a supervisory capacity, I have had numerous complaints on Lieutenant T.S. Alford ... from both supervisors and subordinates alike. These are not my complaints, but are the complaints of the individuals that work with and around [her]. On the other hand, I have had no such complaints of this nature concerning Lieutenant Cochran....

> Although this may seem minor, it is, in the long run, very important for the overall efficiency of the operation.

Wilson's letter had not been written until June 4, just one day before the hearing on Alford's objection and over a month after the mayor had announced Cochran as his choice.

## II.

■ The method of establishing a retaliation claim is essentially the same as for a claim of race or sex discrimination. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600–01 (11th Cir.1986). An employee has the initial burden of establishing a prima facie case of unlawful retaliation by a preponderance of evidence, which once established raises a presumption that the employer retaliated against the employee. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case, an employee must show that she was engaged in protected opposition to Title VII discrimination; that she suffered adverse treatment simultaneously with or subsequent to such opposition; and that there was a causal link between the protected opposition and the adverse treatment. *Donnellon v. Fruehauf Corp.*, 794 F.2d at 600–01.

■ If the employee establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer retaliated against the employee. This may be done by the employer articulating a legitimate, nonretaliatory reason for the employment decision, which is clear, reasonably specific and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *Burdine, supra.*

■ Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for retaliation. The employee may satisfy this burden by persuading the court either directly that a retaliatory reason more than likely motivated the employer or indirectly that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies her ultimate burden of demonstrating by a preponderance of the evidence that she has been the victim of unlawful retaliation. *Burdine, supra.*

However, where, as in this case, a court has conducted a full hearing and has sufficient evidence to make a determination of whether an employee has been a victim of retaliation, the court need not go through the above burden-shifting process and should go ahead and reach the ultimate issue of retaliation. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478,

1481–82, 75 L.Ed.2d 403 (1983); *Powers v. Alabama Department of Education*, 854 F.2d 1285, 1290 (11th Cir.1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989). The court does that here.[4]

At the June 5 hearing on Alford's challenge to the selection of Cochran, the mayor stated that his reasons for rejecting Alford were contained in a letter Chief Wilson had written the day before. In that letter, Chief Wilson stated that he did not recommend Alford because he was concerned about her "ability to communicate, work well, and get along with fellow employees, both supervisors and subordinates." Wilson explained in his letter that he had received "numerous complaints on Lieutenant T.S. Alford ... from both supervisors and subordinates alike."

When called to testify at the June 5 hearing, Chief Wilson described three incidents which he claims justify the conclusions in his letter.[5] In the first incident, which appears to have occurred at least three years ago, Alford came to Wilson's office to discuss the Pierce–Hanna litigation. Because Wilson refused to discuss the case, Alford became upset and wrote a letter of resignation which Wilson refused. The second incident also occurred at least three years ago and arose when a subordinate of Alford's asked to be transferred because he could not get along with her. Wilson said that although the complaint lacked merit—the subordinate was apparently refusing to keep his office tidy—Alford had not handled the matter as well as she might have. The third incident was, however, more recent. Wilson testified that in early 1989, several officers complained that Alford was unprofessional in her language and manner when she criticized their performance in executing a search.

The court must reject the reasons offered by Wilson because the evidence not only fails to support the reasons, it is at odds with them. First of all, Wilson's concerns about Alford, singly or together, were not serious enough in Wilson's own mind to justify rejecting her. Earlier in this litigation, before the court ordered the defendants to promote a woman, Wilson gave testimony that made clear he did not believe that Alford had anything in her background which would warrant rejecting her if she were ranked number one. He indicated that, if Alford were number one on the promotion list, he would promote her and would not reject her. He testified:

[Question.] You felt she was qualified for the position of captain?

[Wilson.] I felt like she was qualified as anybody else on the list was qualified. If she had been number one on the list and I was going to pick somebody off the list, I would have picked her, if that answers your question. I would not have rejected her.

Deposition of John Wilson, dated September 27, 1989, p. 13. Moreover, later, at the June 5 hearing on Alford's objection to the selection of Cochran, Wilson added that he

**4.** In any event, Alford has established a prima facie case. She has met the first part of the three-part test: she was an active participant in this litigation. She has met the second part as well: the mayor passed over her name to promote another woman to captain. And the third requirement of causal connection is met by the fact that the mayor's refusal to promote her came shortly after her participation in these proceedings. *See Donnellon v. Fruehauf*, 794 F.2d at 601 (the short period of time between filing of discrimination complaint and discharge established causation). Schlei and Grossman, *Employment Discrimination Law*, 2d Ed., at 559 ("Closeness in time between the employer's knowledge of the protected ... participation and the adverse activity" may establish causation).

Causation is also established for the reasons given later in this opinion as to why Wilson's reasons for rejecting Alford are a pretext for retaliation. For example, Wilson failed to follow his announced policy of promoting "top to bottom" absent evidence of documented disciplinaries. His actions also were not in conformity with the testimony he gave earlier in this litigation, before this court ordered the defendants to promote a woman, that he would promote Alford if she were number one on the promotion list.

**5.** At the hearing on Alford's objection, Wilson was initially hesitant and vague about what specific incidents he had to justify his comments about Alford in his letter. It was apparent that he was trying to come up with reasons during his testimony. The manner in which Wilson testified about the three incidents reaffirms the court's conclusion that the reasons given by Wilson for rejecting Alford are pretextual.

had not learned anything new about Alford since his earlier testimony.[6]

Second, in February of 1989, the Mayor of Montgomery, who previously had played an intimate, day-to-day role in the operations of the police department, relinquished his hands-on control to Chief Wilson. *Jordan I*, 649 F.Supp. at 1048 (discussing prior hands-on control of mayor). Wilson made known immediately that he would not follow the mayor's practice of freely jumping over the names of candidates certified for promotion by the personnel board.[7] At a staff meeting, Wilson stated that he would recommend promotions "from the top down" and that "if you are number one on the list then you can get your gear ready to be promoted," unless there is a "documented" "disciplinary action" on the file which warrants rejecting you.[8] Wilson thus made clear that he would not attempt himself to compare the five candidates certified by the personnel board, but would instead, absent some serious documented disciplinary, defer to the comparative evaluations reflected in the candidates' rankings. As stated, these comparative evaluations were done under an evaluation process which had been created and supervised by professional staff at Auburn University at Montgomery.[9] Shortly after Wilson announced the new policy, he lived up to his word and promoted the number one ranked candidate to major and the number one ranked candidate to captain.[10]

Wilson did not, however, live up to his word when Alford became number one. None of the three complaints Wilson had against Alford was a documented "disciplinary." Neither of the two three-year old incidents—the incident in which a subordinate failed to keep his office tidy and the incident in which Wilson refused to discuss this litigation with Alford—was in Alford's file as a disciplinary; nor was the more recent incident, in which several officers

---

6. Wilson testified:

   [Question.] Do you know anything about ... Lieutenant Alford now that you did not know on September 27th, 1989?
   [Wilson.] No, ma'am, not necessarily.

7. For example, when the mayor was selecting captains in 1988, he skipped over the first and third ranked candidates.

8. At the hearing on Alford's objection, Wilson attempted to restrict his "top-to-bottom" comment as applying to only the proposed permanent plan which is now being developed. He said that he meant he would promote top to bottom when the permanent plan is in place. He testified:

   [Question.] Have you also made the statement repeatedly that you plan to promote the first person on the list and go straight down the list however it comes out?
   [Wilson.] If I could get everybody to hold on and get a permanent system in place, yes, ma'am.
   Q. Are you saying that those statements were limited to the permanent system and not the interim system?
   A. That was my intention, yes, ma'am.
   The evidence is, however, overwhelming that when Wilson made his top-to-bottom comment he was referring to all future promotions, those under the interim plan and the permanent plan.
   First of all, Wilson himself finally admitted during the hearing that his comment applied to the interim plan as well, and in particular to the promotion to be made under the court's April 9 order. He testified:
   [Question.] When the female position came up, was it your intent to promote from the top down?
   [Wilson.] I would say yes, sir. I would be safe in saying it was my intent barring anything.
   Second, Wilson made the comment during a staff discussion about the proposed promotion of a black police officer under the interim plan. Wilson indicated that, absent documented disciplinaries, the first on the list would have to be promoted. Third, seven of Wilson's majors testified that they heard him make the statement and none said that he or she understood the statement to be restricted to the permanent plan. Finally, Wilson in effect reaffirmed the comment when he observed that if Alford were number one on the promotion list he would appoint her and would not reject her.

9. The court has therefore not had to embark on the difficult process of attempting to compare Alford's over-all qualifications with those of Cochran's. The court has instead followed Wilson's lead and framed the issue as whether one could in good faith conclude that Alford should be disqualified because she had documented disciplinaries. The issue is not whether she is overall more qualified than Cochran.

10. In making these two selections, Wilson stated that he thought the mayor had unjustly skipped over the first ranked candidate for captain in

complained about Alford's language and manner, in her file as a disciplinary.[11] Alford had no disciplinaries on file. Furthermore, two of the three incidents were not documented. Only the third incident, involving the complaint about Alford's language and manner, could be considered documented.[12] Wilson had no basis for refusing to select Alford for promotion, and he unequivocally recognized this when he admitted in an earlier deposition that he would pick Alford if she were number one.[13]

■ The above reasons are sufficient for concluding that Alford has been a victim of retaliation. The record, however, contains additional evidence which reinforces this conclusion. First, the court is troubled by the fact that the reasons given by Wilson for rejecting Alford were not given by the mayor at the time he selected Cochran. Wilson's reasons were not made known until over a month later, at the hearing on Alford's objection. This delay casts serious doubt as to whether the reasons given in Wilson's letter were the true reasons.

Second, it appears that Wilson rejected Alford without consulting her department head or her immediate superviser. The court believes it unusual that Wilson would make this decision about Alford, the number one ranked candidate, without consulting those who know the most about her, especially in light of the fact that he has criticized the mayor's past practice of freely skipping over candidates and the fact that two of the incidents he relies on to reject Alford occurred three to four years ago.[14] Third, it is apparent that the first incident described by Wilson—in which he refused to discuss the Pierce–Hanna litigation with Alford—played no role in his decision to reject Alford, and was instead grabbed by him after he had already rejected her, in an effort to justify his decision in court. In his letter to the mayor giving his reasons for rejecting Alford, Wilson wrote that "these are not my complaints, but are the complaints of the individuals that work with and around [her]." Wilson, therefore, made clear that he had no complaints of his own for rejecting Alford.[15]

1988, *see* note 7, *supra.* Wilson said that this would not happen in the future.

11. The third incident—in which officers complained about Alford's language and manner—did result in a counseling or disciplinary form being placed in her file. The form or disciplinary was later withdrawn, however. In fact, Wilson testified that he did not consider the form in reaching his decision to reject Alford. The incident was therefore not in Alford's file as a documented disciplinary.

12. Wilson said that, although in his view the disciplinary form was purged from Alford's file and could not be considered as documentation of the incident, *see* note 11, *supra,* he still considered the statements given by the officers in support of the form as documentation because, in his view, they were not purged from her file. Wilson drew this so-called "distinction" only after he realized that the disciplinary form had been withdrawn.

13. Although the court has not attempted to compare Alford's qualifications with Cochran's, it is significant that in Wilson's eyes they were equally qualified for promotion. Wilson testified:

[Question.] Do you feel today that Tommi Lee [Alford] is just as qualified?
[Wilson.] I feel Tommi Lee [Alford] is very qualified. But I have to make a decision. I can't give it to both of them. She is just as

qualified as Marti Cochran. And Marti Cochran is just as qualified as Tommi Lee [Alford]. This observation by Wilson is significant because it is further evidence that Wilson's three complaints about Alford were not important enough to disqualify her for the promotion or to justify Wilson's skipping over her to reach Cochran. The complaints apparently did not affect Wilson's overall evaluation of Alford, at least to the extent that they rendered her less qualified than Cochran.

14. One could also reasonably take issue with Wilson's characterization in his June 4 letter that the complaints against Alford are "numerous." Wilson was able to recall only three complaints, and two of them were three to four years old.

15. The three-year old incident in which Wilson refused to discuss this litigation with Alford itself raises the spectre of an improper motive. The incident arose as a result of a deposition Alford gave in this litigation. During the deposition, she became very upset by some of the questions the Pierce–Hanna intervenors' attorney was asking her. After the deposition, she was told by her supervisor that Wilson was upset with her and that she needed to go see him. When she went to see him, Wilson became angry and refused to talk to her. She in turn became upset and later submitted her resignation, which Wilson did not accept. The record is, however, unclear as to whether Wilson was upset with her because of her perform-

The court has focused on Chief Wilson's motivation because the Mayor of Montgomery, Emory Folmar, informed the court at the June 5 hearing on Alford's objection that he was relying on the reasons given by Wilson for rejecting Alford. It is nonetheless significant that Mayor Folmar shares Wilson's dislike of Alford because of her participation in this litigation, and that for this reason Folmar agreed with Wilson's decision to pass over Alford's name. Folmar made the following comments during a radio talk show on June 14, 1990, about the "participation" of Lieutenant Alford and her husband, Colonel Alford, in litigation against the city:

... I'm not the least bit happy about the lawsuits that either one of them have participated in both ex-Colonel Alford and his wife. They both been prominent in lawsuits against the city and ah, I just ... I don't have much use for either one of 'em.[16]

In addition, since Lieutenant Alford sided against the city in this litigation, Folmar has been uncharacteristically cold towards her.

A further significant consideration in the court's determination that Wilson's motive was retaliatory is the fact that the reasons Wilson gave for rejecting Alford are, at least in substantial part, subjective. A primary problem posed by subjective criteria in employment discrimination and retaliation suits is that rigorous evaluation by the factfinder of the weight accorded these factors by the employer is extremely difficult. The Eleventh Circuit has noted before, in language applicable to the setting at hand, the difficulties encountered by courts in weighing an employer's proffered reliance on subjective criteria in justifying an employment decision.

This circuit has frequently noted the problems associated with this type of worker assessment and noted that subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination. This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another. In addition, subjective and vague criteria may be insufficient reasons given by an employer for its failure to rehire because such criteria do not allow a reasonable opportunity for rebuttal. The employee is left without any objective criteria to point to in order to show competence.

*Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir.1985) (citations and footnotes omitted). *See also Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2797, 101 L.Ed.2d 827 (1988) (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in the judgment) (cautioning, in a disparate impact context, against "[a]llowing an employer to escape liability [under Title VII] simply by articulating vague, inoffensive-sounding subjective criteria"). Though *Miles* involved allegations of racial discrimination under Title VII, the appellate court's admonition to district courts to view with caution an employer's reliance on subjective criteria applies with full force to the claim of retaliation in this case. Indeed, when Wilson vowed in February of 1989 to promote top to bottom unless there is documented evidence of disciplinaries, he implicitly recognized that undocumented subjective criteria could be used, and in the past may have been used, for suspect reasons.

Finally, the court cannot overlook the history of retaliation in the police department. There is the recent holding by the court that, for retaliatory reasons, Chief Wilson refused to appoint as his deputy chief any one of the four majors who had participated on the side of plaintiffs in the *Jordan* litigation and in a companion case. *See United States v. City of Montgomery*, 744 F.Supp. 1074 (M.D.Ala.1989), *aff'd*, 911 F.2d 741 (11th Cir.1990) (table). There is,

---

ance and testimony during the deposition. Wilson's description of the incident is vague, and Alford says that, because Wilson refused to talk to her, she never learned from him why he was angry with her. In any event, the court has not relied on this incident as evidence of retaliation.

**16.** Lieutenant Alford's husband, Colonel Alford, has not actually filed any lawsuits against the city as far as the present record in this case shows. Folmar is, therefore, upset with him, as he is with Lieutenant Alford, for his mere participation in litigation against the city.

of course, also the retaliation by Mayor Folmar which led to the provision in the interim promotion plan which allows female police officers to file claims of retaliation in this litigation. *Jordan I,* 649 F.Supp. at 1060–62, 1063–65; *Jordan II,* 667 F.Supp. at 776–77, 780.

## III.

■ The final issue for the court is the appropriate relief. Because it is apparent that the reason Chief Wilson refused to recommend Alford for promotion to captain was impermissible—because of her prominent role in this litigation—the court is left with no choice but to require the defendants to promote her to that position forthwith. Alford is also entitled to the relief afforded by this court in its order of April 9, 1990. *United States v. City of Montgomery,* 744 F.Supp. 1089 (M.D.Ala.1990). In that order, which required the defendants to promote a women to the rank of captain, the court further stated that the promotion must be made "retroactively, with such backpay and other benefits [the female police officer] would have received had she been promoted in a timely fashion under the interim promotion plan." *Id.*

## IV.

In conclusion, the court adds that it is with great reluctance that it is sustaining Alford's challenge and requiring that the defendants promote her. Both Alford and Cochran appear to be fine officers worthy of promotion, and it is unfortunate that they cannot both be promoted.[17] However, Wilson has repeatedly made clear that he would in instances such as those presented here promote "top to bottom." His failure to live up to his word, without justifiable reason, leads the court to the conclusion that he has retaliated against Alford because of her prominent role in this litiga-

tion. Alford is therefore entitled to promotion under the interim plan.[18]

An appropriate judgment will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the challenge to appointment of lower candidate to rank of captain, etc., filed by the Pierce–Hanna intervenors on behalf of Lieutenant Tommi Lee Alford on May 11, 1990, be and it is hereby sustained; and

(2) That the defendants—the City of Montgomery, Alabama and its mayor and police chief—their officers, agents, servants and employees and those persons in active concert or participation with them who receive actual notice of this order, be and they are each hereby ENJOINED and RESTRAINED from failing to promote Lieutenant Tommi Lee Alford forthwith to the rank of captain retroactively, with such backpay and other benefits she would have received had she been promoted in a timely fashion under the interim promotion plan.

The clerk of the court is DIRECTED to issue a writ of injunction.

---

17. Cochran also has litigation against police department officials. However, in her lawsuit she claims that she was retaliated against by two of her supervisors because she was "identified with" the mayor. *Cochran v. Folmar,* civil action no. 89–H–893–N.

18. The court agrees with Chief Wilson that his top-to-bottom policy should not be viewed as irrevocable. However, at the time the court issued its April 9 order requiring the defendants to promote a female officer to captain, Wilson had not withdrawn or modified the policy.

The court would nevertheless add that Wilson may be confronted with special circumstances which would justify his not following the policy—that is, he may find it appropriate not to promote the highest ranked person even though he or she has no disciplinaries. There were no special circumstances in Alford's case, however.